IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| PHILLIP MARRITT, | ) | Case No. 3:18-cv-0119 |
| --- | --- | --- |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

I.  **Introduction**

Plaintiff, Phillip Marritt, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for supplemental security income under Title XVI of the Social Security Act ("Act"). The parties consented to my jurisdiction. ECF Doc. 10. Because the ALJ supported her decision with substantial evidence and because Marritt has not identified any incorrect application of legal standards, the final decision of the Commissioner must be AFFIRMED.

II.  **Procedural History**

Marritt protectively applied for supplemental security income benefits on July 1, 2014. (Tr. 236-244). After his claim was denied initially (Tr. 173-179) and on reconsideration (Tr. 183-188), Marritt requested a hearing. (Tr. 188-190). Administrative Law Judge ("ALJ") Melissa Warner heard the case on September 1, 2016 (Tr. 41-72) and found Marritt not disabled in a February 8, 2017 decision. (Tr. 18-29). The Appeals Council denied Marritt's request for

further review on November 16, 2017 (Tr. 1-3), rendering the ALJ's decision the final decision of the Commissioner. Marritt initiated this action to challenge that decision.

## III. Evidence

### A. Relevant Medical Evidence[1]

X-rays on October 15, 2014 showed moderate lower lumbar facet arthrosis and degenerative disc disease at L5-S1. (Tr. 351).

Marritt presented as a new patient to nurse practitioner, Amy Homan, on May 11, 2015. He had not been examined or taken medications for two years. (Tr. 624). Ms. Homan diagnosed diabetes, benign hypertension, major depression and joint pain. (Tr. 626). She prescribed medications and scheduled a return visit for two weeks. (Tr. 626-627). When Marritt returned two weeks later, he had arthralgias in his shoulders, hips and knees. He had limited range of motion and muscle weakness in both upper extremities. His gait and station were normal. (Tr. 631). Physical examination findings were similar in August and December 2015. (Tr. 635-637, 641-643).

Marritt started treating with Timothy Drehmer, M.D., on February 9, 2016. Dr. Drehmer noted a long-standing polyarthralgia without clear evidence of synovial-based inflammation. Marritt also had a "fair number of myofascial tender points." Dr. Drehmer noted that Marritt's pain seemed "mechanical in nature." His hip pain was worse with weightbearing and internal rotation. (Tr. 373). Physical examination showed reduced range of motion in the shoulders with mild tenderness over the acromioclavicular (AC) joint; full range of motion without pain in the neck; tenderness in the elbows with full range of motion; tenderness over the L3-L4 region with

---

[1] Marritt cites a very limited portion of the medical evidence as relevant to his appeal. ECF Doc. 14 at Page ID# 824-825.

2

spinal tenderness extending to the upper thoracic region; lumbar tenderness that extended posteriorly into the buttocks; and fairly normal range of motion in the hips although some tenderness in the groin. (Tr. 377). Dr. Drehmer advised Marritt to start conditioning and strengthening in the joints and to start a walking program; he recommended that Marritt manage his pain symptoms with over-the-counter medications, such as glucosamine and chondroitin. (Tr. 373-374).

X-rays taken on February 9, 2016 of Marritt's hips and pelvis showed no acute abnormalities or significant degenerative changes; an x-ray of his right knee showed minimal spurring in the anterior compartment and mild medial joint space loss with preservation of the anterior and lateral joint spaces; and an x-ray of his left knee revealed mild medial joint space loss and mild lateral joint space loss. (Tr. 382).

Marritt followed-up with Dr. Drehmer on February 29, 2016. (Tr. 413-418). Dr. Drehmer assessed polyarthralgia with limited evidence of joint based inflammation (bilateral third metacarpal joints only), mechanical pain in weight-bearing joints such as his hips, and a component of myofascial pain. (Tr. 413). The doctor again advised that exercise would be a key factor in strengthening his joints and in reducing pain. He told Marritt to continue taking over-the-counter glucosamine/chondroitin; and said that it was "OK" to take non-steroidal anti-inflammatory drugs (NSAIDS) such as ibuprofen. (Tr. 413).

When Marritt returned to see Dr. Drehmer in May 2016, the doctor's assessments and physical examination findings were similar to previous visits. (Tr. 420-425). Dr. Drehmer continued to recommend exercise, over-the-counter glucosamine/chondroitin, and NSAIDs. He scheduled a follow-up visit for six months. (Tr. 420).

3

B.     **Opinion Evidence**

1.     **Consulting Examiner – B.T. Onamusi, M.D., - Oct0ber 2014**

On October 15, 2015, B.T. Onamusi, M.D., performed an internal medicine evaluation. (Tr. 352-354). Physical examination showed normal muscle power and tone in all muscle groups; negative Babinski's sign bilaterally; negative Roberg sign; diminished to absent ankle reflexes but normal sensation, normal vibration sense, and normal joint position sense. (Tr. 353-354). Marritt walked with a normal gait; had no trouble transferring to the examination table; was able to walk on his heels and toes with mild difficulty; but he declined squatting. He was able to grip and grasp with both hands; reach forward, push or pull with the upper extremities; and to use his hands for fine coordination and manipulative tasks. (Tr. 354). The joints of his extremities appeared normal; there was mild to moderate tenderness involving the shoulders, hips, and knees; no joint deformity; mild tenderness at the lower cervical spinous processes and mild tenderness in the lumbar sacral junction region; no paraspinal muscle spasm; Spurling maneuver was negative; and straight leg raise testing was also negative. Dr. Onamusi assessed diabetes mellitus with early features of diabetic neuropathy; and chronic neck, back and polyarticular pain of the extremities, probably secondary to degenerative disease. He opined that Marritt was capable of functioning at the light physical demand level. (Tr. 354).

2.     **Other Source – Occupational Therapist, Scott B. Gels**

Occupational therapist, Scott B. Gels, performed a physical work evaluation on March 28, 2016. (Tr. 393-403). Mr. Gels opined that Marritt "participated fully in all tasks." (Tr. 393). Testing showed that Marritt was able to lift 15 pounds from floor to waist with a reported pain score of eight; he could climb stairs with a reported pain score of four and a half; he could repetitively squat with a pain score of eight, although a later remark indicated that he was unable

4

to squat; he could lift 15 pounds from waist level to eye level with a pain score of eight; he could unilaterally carry 35 pounds with a pain core of zero; push 64 pounds with a pain score of seven; pull 42 pounds with a pain score of seven; sit for five minutes with a pain score of five; stand for five minutes with a pain score of seven; work at a bent over/stooping position for three minutes with a pain score of six; kneel for one minute and 17 seconds out of five minutes with a pain score of eight; work bent over while sitting for only 40 seconds with a pain score of nine; was unable to work overhead at the supine position; walk with a pain score of seven and a half; crawl with a pain score of nine and a half; he could not climb a ladder; he could perform repetitive trunk rotation while sitting with a pain score of eight and while standing with a pain score of seven. (Tr. 399-400).

Mr. Gels observed pain behaviors such as Marritt using a box to push himself to an upright position, pushing off his legs every time while getting out of a chair, and needing assistance from the floor during kneeling/crawling tasks. (Tr. 394). Mr. Gels opined that Marritt's overall work capabilities fell within the light exertional range, but that he was incapable of sustaining that level of work for an eight-hour day/40-hour week. Mr. Gels opined that Marritt would be able to tolerate an eight-hour day at the sedentary exertional level. (Tr. 393).

### 3. State-Agency Reviewing Physicians

State agency reviewing physician, Michael Delphia, M.D., reviewed Marritt's file on October 18, 2014. Dr. Delphia opined that Marritt could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ramps/stairs, stoop, kneel, crouch, crawl and reach overhead; never climb ladders, ropes, or scaffolds; and was required to avoid all exposure to hazards such as machinery and heights. (Tr. 150-153).

5

State agency reviewing physician, James Cacchillo, D.O., reviewed Marritt's file on December 19, 2014 and agreed with the opinions expressed by Dr. Delphia. (Tr. 162-165).

### C. Testimonial Evidence

#### 1. Marritt's Testimony

Marritt testified at the hearing on September 1, 2016. (Tr. 46-64). Marritt was 51 years old and lived by himself. He drove himself to the hearing, with some difficulty. (Tr. 46). Marritt did his own household chores, shopping and meal preparation. (Tr. 52). For enjoyment, he read, played games with friends and played on his computer. (Tr. 53). He often played games with friends two to three times per week and played strategy games on his computer a few hours a day. (Tr. 52-54). Marritt has a bachelor's degree in psychology. (Tr. 47). Other than a work-study program, Marritt had not worked since 2000. (Tr. 47).

Marritt's arthritis kept him from working; he fatigued easily. (Tr. 48). He started having problems with his knees around 2000 and with his hips, five or six years before the hearing. (Tr. 48). He also had arthritis in his shoulders and back. He was starting to feel arthritis in his ankles, elbows, hands, and even his jaw. (Tr. 48, 61). Marritt was taking medications for his symptoms. The medication caused frequent headaches. (Tr. 49).

Marritt slept five to six hours a night. (Tr. 50). He had sleep apnea and was using a CPAP machine. (Tr. 50). He often fell asleep during the day while lying down due to pain. (Tr. 51). Marritt had a history of depression. He was taking medications that helped with the depression. (Tr. 51). Marritt frequently visited with friends and family. (Tr. 53-54). However, he could be very grouchy on "bad days." (Tr. 57).

Marritt estimated that he could walk a couple of blocks, stand no more than 15 minutes at a time, sit for no more than 30 minutes to an hour, and needed to get up about every two hours. (Tr. 55). He did not think that he could sustain a full-time job due to his symptoms. (Tr. 63).

### 2. Vocational Expert's Testimony

Vocational expert ("VE"), John R. Finch, also testified at the hearing. (Tr. 65-70). The VE testified that there would be a significant number of jobs available for an individual who could perform work at the medium exertion level but was limited to frequent climbing stairs, occasional climbing ladders, occasional stooping greater than 90 degrees, occasional kneeling, frequent crouching, and rare crawling. (Tr. 66). This individual would be able to perform the jobs of custodian, order picker, and hand packager. (Tr. 66-67). If this same individual's exertional level was lowered to sedentary, he would still be able to perform a significant number of jobs, such as the jobs of information clerk, order clerk, and document preparer. (Tr. 67). And, the VE's opinion was not changed if the individual was unable to perform fast-paced work, could have no exposure to obvious hazards, and was limited to occasional overhead reaching. (Tr. 67). However, the VE testified that, if the individual were limited to occasional reaching in any direction, he would not be able to perform work at the medium or light exertional level. (Tr. 70).

After the administrative hearing, the ALJ submitted interrogatories to the VE for further opinion. In response, the VE identified jobs a person with Marritt's capabilities would be able to perform at the light exertional level. (Tr. 321-327).

## IV. The ALJ's Decision

The relevant portions of the ALJ's decision (Tr. 14-29) are paraphrased below:

4. Marritt had the residual functional capacity to perform light work except he could frequently climb stairs; occasionally climb ladders; occasionally kneel,

7

frequently crouch; rarely crawl; and occasionally stoop greater than 90 degrees. (Tr. 24).

9. Considering Marritt's age, education, work experience and residual functional capacity, there were jobs existing in significant numbers in the national economy that he could perform. (Tr. 27).

Based on her ten findings, the ALJ determined that Marritt had not been under a disability since July 1, 2014, the date his SSI application was filed. (Tr. 29).

## V.     Law & Analysis

### A.     Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g).and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270,

273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Administration must follow a five step sequential analysis: at Step One, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step Two,

the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step Four, the Commissioner determines whether the claimant can still perform his past relevant work; and finally, at Step Five, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §404.1512(a).

## B. Evaluation of Medical Opinions

Marritt argues that the ALJ erred in failing to properly evaluate the medical opinions in the record. Specifically, he contends that the ALJ failed to evaluate the opinions of Dr. Onamusi and occupational therapist, Scott Gels. ECF Doc. 14 at Page ID# 828. In determining disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). The Code of Federal Regulations describes how medical opinions must be weighed:

> (c) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your

10

> medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. ...
>
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion . . . .
>
> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
>
> (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
> . . .

20 CFR § 416.927(c). See also 20 CFR § 404.1527(c).

In this case, there were no treating source opinions. Thus, none of the opinions was entitled to controlling weight, and the ALJ was only required to evaluate each of the medical opinions in the record. And she did.

### 1. Dr. Onamusi

Regarding Dr. Onamusi, the ALJ summarized the doctor's findings (Tr. 25), and later cited his opinion in support of her finding that Marritt was capable of performing work activity. (Tr. 27). The fact that the ALJ did not assign a specific weight to Dr. Onamusi's opinion is of little significance here. The ALJ's RFC determination was more restrictive than Dr. Onamusi's opinion. Marritt does not explain how he was prejudiced by the ALJ's failure to state the specific weight assigned to Dr. Onamusi's opinion. In *Norris v. Comm'r of Soc. Sec.,* 461 F.

App'x 433, 440 (6th Cir. 2012), the Sixth Circuit held that the ALJ was under no special obligation to provide a detailed explanation of how he weighed the nonexamining opinions versus the nontreating opinions. The court held that, "[s]o long as the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements to survive this court's review." The court also noted:

> An ALJ need only explain its reasons for rejecting a treating source because such an opinion carries "controlling weight" under the SSA. *See Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 876 (6th Cir. 2007) 876. Accordingly, a claimant is entitled under the SSA only to reasons explaining the weight assigned to his treating sources, independent of the success of his disability benefits claim. *Id*. at 875.

Here, the ALJ evaluated Dr. Onamusi's opinion. The ALJ could have provided a more thorough explanation of the weight assigned to Dr. Onamusi's opinion, but her failure to assign a specific weight to the opinion is of no significance here. The ALJ's RFC determination was more restrictive than the opinions expressed by Dr. Onamusi. And Marritt does not argue that the express adoption or rejection of any of Dr. Onamusi's opinions would have had any impact on the outcome of his claim. Thus, any contended error in the handling of Dr. Onamusi's opinions was harmless at worst.

### 2. Occupational Therapist, Scott Gels

Next, Marritt argues that the ALJ erred by failing to evaluate the opinion of occupational therapist, Scott Gels. ECF Doc.14 at Page ID# 828. However, the ALJ did evaluate the testing performed by Gels. She summarized the findings of the testing (Tr. 26) and partly relied on this testing in finding that Marritt was able to perform work. (Tr. 27). The fact that she did not mention Mr. Gels by name is of no significance in the court's review of the ALJ's findings. Dr. Gels was an "other source."

SSR No. 06-03p, 2006 SSR LEXIS 5, states that "other sources" are important and should be properly evaluated:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR No. 06-03p also provides factors to be applied in evaluating opinion evidence from "other sources." These factors include:

1) How long the source has known and how frequently the source has seen the individual;
2) How consistent the opinion is with other evidence;
3) The degree to which the source presents relevant evidence to support an opinion;
4) How well the source explains the opinion;
5) Whether the source has a specialty or area of expertise related to the individual's impairment (s), and
6) Any other factors that tend to support or refute the opinion.

*Id.*

Here, the ALJ did not mention the name of the occupational therapist who evaluated Marritt. She only referred to the "occupational testing," that Mr. Gels performed. (Tr. 26, 27). But, Mr. Gels did not have an ongoing relationship with Marritt and the objective portion of the record that he provided was, in fact, the occupational testing to which the ALJ referred. The ALJ obviously considered Mr. Gels' occupational testing because she summarized it and partly relied on it in finding that Marritt was capable of performing work activity. (Tr. 27). The ALJ was not required to assign controlling weight to Mr. Gels' opinion because he was not an acceptable treating source. She was required to evaluate his testing – and it is quite obvious that she did.

As with the analysis of Dr. Onamusi's opinion, the ALJ could have provided a better explanation of her evaluation of Mr. Gels' opinions. But, Marritt has not shown that the ALJ erred in evaluating the nontreating sources. She was neither required to assign controlling weight to them nor to provide good reasons for failing to do so. *See Norris,* 461 F. App'x at 440.

### 3. State Agency Reviewing Physicians

Marritt also argues that the ALJ erred by assigning "some weight" to the state agency reviewing physicians. He further argues that the ALJ inadequately explained which sections of the state agency reviewers' opinions she accepted. ECF Doc. 14 at Page ID# 829-830.

The regulations provide that "state agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 416.927(e)(2)(i). The ALJ is required to "consider findings of state agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether [the claimant] is disabled." *Id.* "In appropriate circumstances, opinions from state agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p.

Regardless of the source of a medical opinion, the ALJ must apply the factors set forth in 20 C.F.R. § 416.927(c) in weighing the opinion, including the examining and treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the source. In addition, the regulations provide that when the ALJ does not assign controlling weight to the claimant's treating physician, the ALJ must explain the weight assigned to the opinions of the medical sources:

> Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any other opinions from treating sources, non-treating sources, and other nonexamining sources who do not work for us.

20 C.F.R. § 416.927(e)(2)(ii).

Here, as noted above, although the administrative record included records from Marritt's treating physician, Timothy Drehmer, the ALJ pointed out that, "there is no evidence that [Dr. Drehmer] believe[d] the claimant is disabled because of physical impairments." (Tr. 26). Thus, there were no treating source disability opinion to which the ALJ failed to accord controlling weight.[2] Nevertheless, though arguably not required to do so, the ALJ assigned some weight to the state-agency reviewing physicians and explained why, stating:

> The undersigned has also considered the opinion evidence in determining the residual functional capacity. Michael Delphia, M.D., a state agency physician, offered an opinion regarding the claimant's functioning. (Exhibit 1A). Dr. Delphia opined that the claimant is able to work at the light exertional level with postural, manipulative, and environmental limitations. (*Id.*) James Cacchillo, D.O., another state agency reviewing physician, concurred with Dr. Delphia's opinion. (*Id.*) The opinions of Dr. Delphia and Dr. Cacchillo are generally consistent with examination findings at Exhibits 1F and 4F. However, the undersigned finds those exhibits indicate that the claimant is capable of performing a reduced range of light work. Therefore, the undersigned assigns only some weight to the opinions of Dr. Delphia and Dr. Cacchillo.

(Tr. 27). The ALJ explained the weight given to the state agency reviewing physicians. But, once again, her explanation of her evaluation certainly could have been more thorough. For example, she assigned some weight to the reviewing physicians' opinions because they determined that Marritt was "capable of performing a reduced range of light work." (Tr. 27). But, the ALJ also determined that Marritt was capable of performing "less than a full range of

---

[2] Arguably, the ALJ gave the treating source opinion of Dr. Drehmer controlling weight by finding Marritt not disabled.

15

light work." Because these two determinations seem congruent, it is unclear how why the ALJ chose to discount the state agency reviewers' opinions, and Marritt's confusion is understandable.

However, when an ALJ's opinion satisfies the goal of § 416.927 and is otherwise supported by substantial evidence, the failure to explicitly explain the weight assigned is harmless error. *See, e.g., Pasco v. Comm'r of Soc. Sec.,* 137 F. App'x 828, 839 (6th Cir. 2005) (harmless error when the ALJ failed to mention or weigh the report of consultative neurologist who only evaluated plaintiff once and was not a treating source); *Dykes v. Barnhart,* 112 F. App'x 463, 467-69 (6th Cir. 2004) (failure to discuss or weigh opinion of consultative examiner was harmless error); cf. *Friend v. Comm'r of Soc. Sec.,* 375 F. App'x 543, 551 (6th Cir. 2010) (explaining that the treating physician rule "is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.")

Here, the ALJ satisfied the goal of the regulations and her decision is supported by substantial evidence. Without doubt, the ALJ's explanations of her evaluation of the medical evidence and opinions left something to be desired. But, there was no disability opinion from a treating source in this case. The ALJ reviewed the treatment notes from Marritt's treating physician and noted,

> The doctor advised the claimant to start conditioning and strengthening his joints as well as start a walking program. Dr. Drehmer also advised the claimant to manage his pain symptoms with over-the-counter medications. (*Id.*) There is no evidence that the claimant's treating physician believes the claimant is disabled because of physical impairments. Rather, the evidence shows that Dr. Drehmer advised to manage his impairments by exercising and using over the counter medications.

The ALJ reviewed the record as a whole. Even if some of her explanations of opinion evidence could have been better, remand is not required here, contrary to Marritt's contentions. The ALJ's decision reflects that she evaluated the medical evidence and substantial evidence supports her findings.

   C.   **Step Five Decision**

Marritt also argues that the ALJ's Step Five finding was not supported by substantial evidence because the ALJ never asked the VE a hypothetical question about an individual who could perform light work. ECF Doc. 14 at Page ID# 832. The ALJ asked the VE questions at the administrative hearing about medium exertional work and a question about sedentary work, but she did not ask him a question about light work. (Tr. 66-67).

However, the ALJ later issued an interrogatory regarding light work and provided notice to Marritt of the same. (Tr. 321-326). The interrogatory asked the VE the following hypothetical question, "[a]ssuming the limitations from hypothetical one, but changing only the exertional category to light work, is there work such a hypothetical person would be able to perform?" (Tr. 324). The VE responded "yes," and listed the following jobs that such an individual could perform: Cleaner, 323.687-014, 300K nation/20K region (state.); Retail Marketer, 920.687-126, 70K nation/5K region (state.); Assembly Machine Tender, 754.685-014, 40K nation/3K region (state.) (Tr. 331).

The ALJ relied on this interrogatory response in her decision at Step Five. (Tr. 28). The ALJ was permitted to rely on the VE's response to interrogatories as substantial evidence supporting her Step Five finding. *McCraney v. Comm'r of Soc. Sec.,* 68 F. App'x 570, 573 (6th Cir. 2003). The Commissioner's brief cites the VE's interrogatory response as support for the ALJ's decision at Step Five. ECF Doc. 8-1 at Ex. 46, Page ID# 547. Marritt's reply brief did

17

not respond to this argument. Marritt's argument that the ALJ's decision at Step Five was not supported by substantial evidence lacks merit, because the ALJ was permitted to rely upon the VE's response to a post-hearing interrogatory. (Tr. 331). The ALJ's decision at Step Five must be affirmed.

## VI. Conclusion

Substantial evidence supported the ALJ's RFC determination and her decision at Step Five. She properly considered the medical opinions and the record as a whole. Because the ALJ's decision was supported by substantial evidence and because Marritt has not identified any incorrect application of legal standards, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

Dated: January 3, 2019

Thomas M. Parker
United States Magistrate Judge